EDWARD C. F. GRUMLEY

v.

AUGUSTUS GRUMLEY et ux. et al.

[Filed June 13th, 1902.]

A father purchased realty for his son, who testified that the father said repeatedly that it was bought with money which had belonged to his deceased first wife, the mother of this son. A brother of the father testified

Grumley *v.* Grumley.

that the father had told him that he intended to keep the money of his first wife until he could find a place to invest it for this son, and that after the property in question was purchased the father told witness that it was paid for with the money of the first wife. During the life of the first wife the husband had purchased two houses and lots and put the title in her name, and in a memorandum of a will, dictated some months before his death, he gave all his interest in these two houses to the son, and the rest of his estate to his second wife and her children.—*Held*, sufficient to show that the property purchased for the son was not intended as an advancement.

*Mr. Philip S. Scovel,* for the complainant.

*Mr. Howard Carrow,* for the defendants.

Reed, V. C.

The question is whether Augustus Grumley, one of three children of Philip Grumley, deceased, is entitled to a share of the real estate of which his father died seized. The bill for the partition of this real estate was filed by Edward C. F. Grumley, a brother of Augustus. He charged, in his bill, that Augustus had been advanced a piece of real estate, valued at $2,500, in 1882, and is therefore disentitled to a share in the property sought to be partitioned.

Augustus, in his answer, denies this.

By the testimony taken it appears that Philip Grumley, the father, bought for Augustus property which was conveyed to the latter in April, 1882. Augustus, who was then sixteen years of age, swears that his father repeatedly told him that he paid for this property with money which belonged to the mother of Augustus, the first wife of Philip, she having died in 1875.

Chauncey Grumley, a brother of Philip, says that about the time the property was conveyed to Augustus, Philip said to the witness:

"I am going to keep that money of 'Chris' ' ('Chris' was the name of his first wife), until I can see where to invest it for the benefit of 'Guss.' He is her son, and I don't think that any of the other children have any title to it at all."

The witness further says that when his brother bought the house he (the witness) was away, and when he came home his brother said to him:

"I bought No. 604 South 6th St., and had the papers made out in 'Guss'' name and paid for it out of the money belonging to 'Chris.' Augustus was the only son of Philip and 'Chris.'"

Chauncey also says that Philip told him that it was money that she had saved by economical living and from building associations.

At the time this property was purchased, in 1882, Philip had married his second wife.

The testimony on the part of the complainant is that Philip, some months before his death, got his brother Chauncey to make a memorandum of a will for him, in which memorandum he gave to Augustus all his interest in two houses, Nos. 532 and 543 North Sixth street, Camden, which had belonged to Christina; then gave a life interest in his real estate to Tillie, his then wife, and, after her death, directed the real estate to be divided equally between his two youngest children, Edward C. and Mary Grumley.

It also appears that Philip had paid for two houses and lots, Nos. 532 and 543 North Sixth street, Camden, in 1873, and put the title in the name of his wife Christina.

The above seems to be the material facts bearing upon the question of advancement or no advancement. That Philip said, at the time the property was conveyed to Augustus, in 1882, that the money with which he paid for this property was "Chris'" seems to me entirely clear. The relation between Philip and his brother Chauncey seems to have been very confidential, and it is impossible to believe that Chauncey is either mistaken or untruthful in detailing the conversation with his brother.

The testimony for the defendant, in respect to the fact that from 1873 the first wife of Philip and mother of Augustus had these two houses, Nos. 532 and 534 North Sixth street, fortifies, rather than refutes, the theory that the purchase made in August, 1882, was intended to be a purchase with money which Philip regarded as belonging to the mother of Augustus. Her

ownership of this property discloses a source of revenue for nine years, which revenue her husband could very properly regard as equitably belonging to her, and, after her death, to her son. The question is not whether he was entitled to her personal property upon her death, and to the income of this property as tenant by the courtesy after her death in 1875, but the question is whether he regarded the money so received as equitably belonging to his son, and therefore whether, when he applied them to the payment of this property in 1882, he intended the transaction as a payment of what was equitably due to his son, or whether he intended it as an advancement.

The purpose of the provision concerning advancement is to preserve that equality between the children of an intestate, which is not only equitable, but which is supposed to be consonant with the desire of a father presumed to have an equal affection for each child. When, therefore, a father turns over to one child, without consideration, a portion of his property during life, such portion is regarded as a part of or as the entire distributive share of such child given to him in advance of his parent's death.

It is equality in the division of the parent's property, which the parent is supposed to desire, that raises the presumption that the transfer to the children or child is an advancement.

So long as the property transferred to the son is the property of the father, or is purchased with the property of the father, the presumption of advancement exists. If, however, it appears that the property transferred to the child, or the property with which such property is bought, is property which the father regards as belonging, either legally, equitably or morally, to the child so favored, to the exclusion of the other children, the presumption of an advancement must cease to exist.

Now, assuming that the declarations were made by Philip, the father, it is clear that he regarded Augustus, standing as the son of his first wife, as entitled exclusively to certain property then held by the declarant. A transfer of a property to a child in pursuance of a moral duty was held to rebut the presumption of advancement in the case of *Beakhust* v. *Crumby, 18 R. I. 689.*

That Philip thought that he was executing a moral duty in transferring the property in question to Augustus I have no doubt.

In respect to the dictation of the memorandum for a will, it is to be observed that the intention manifested by the memorandum was not carried out, and may have been abandoned. But assuming that such intention was retained, it casts no light upon the original purpose of the testator in 1882. Philip no doubt thought, at the time he dictated the memorandum, that Augustus was so well provided for by his ownership of two houses, which he inherited from his mother, and of the houses deeded to him in 1882, that, taking into account the amount of property which Philip then had to devise, it would be wise to leave his real estate to his widow and his two other children. It did not, however, exhibit an intention, in 1882, that the property then conveyed to Augustus should be taken as a part of his estate in any distribution of his property to be made upon his death.

I am of the opinion that Augustus is entitled to his share of the land involved in the present suit, and therefore of the money raised by the sale of the property.